**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| KENNETH TAYLOR,<br><br>Plaintiff,<br><br>v.<br><br>THOMAS DART, SHERIFF OF COOK COUNTY, ET AL.,<br><br>Defendants. | No. 23 CV 16024<br><br>District Judge Kocoras<br><br>Magistrate Judge McShain |

**MEMORANDUM OPINION AND ORDER**

This case is before the Court for resolution of defendants' affirmative defense that plaintiff Kenneth Taylor failed to exhaust his administrative remedies.[1] For the following reasons, the Court concludes that the exhaustion doctrine does not bar plaintiff's claims.

## Background

This is a civil-rights case under 42 U.S.C. § 1983 in which plaintiff alleges that three correctional officers–defendants Hidalgo, Mintah, and Ochoa–used excessive force on him during an altercation on February 24, 2023, when plaintiff was detained at the Cook County Jail. Defendants answered the complaint and raised the defense of failure to exhaust administrative remedies. [35] 9-10.[2]

### A. The Grievance

The issues now before the Court arise from a grievance about the alleged use of excessive force that plaintiff submitted to jail authorities on February 26, 2023. Plaintiff's grievance stated that:

> On Feb. 24, 23 at approximately 6:30 pm, I headed out my cell for my dayroom hours & was pat down by Officer Hildago #18391 & Officer Mintah # 18358 said officer went in my pocket & proclaim to have found something in my pocket at which time said officers became very forceful

[1] The parties have executed a limited consent to the undersigned's jurisdiction for purposes of conducting and resolving the issues related to the *Pavey* hearing. [82].

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of the fillings.

> – pushing /grabbing me hard on the wall, I informed said C/O's that I had nothing in my pocket at which time officers became all the more aggressive pushing my face in the wall with force, chocking me and hitting me hard down the side of my body telling me to spit something out. At no time did I in anyway disrespect or assault C/Os but continued applying force to my face & ribs telling me give it to them or they would beat the shit out of me, that of which I feel they did by damaging my ribs & swelling my face. At no time was anything taken from my possession. I was taken to Cermak Hospital & due to my experiencing seizure attacks & all the injuries incurred to my head, arms & ribs, I had to be taken to the Cook County Hospital for treatment & was placed on medication. I was returned to the institution & transferred to the Medical Division. Again, please note: I now suffer from pain in my face – Black eye swollen & in pain swelling to eye, ribs, arms. I did not in anyway disrespect C/Os or in anyway assault these C/O's.

[97] 2-3 at ¶ 5 (parties' stipulation for *Pavey* hearing reproducing contents of grievance); *see also* Def. Exh. C at CCSAO 42-43 (copy of plaintiff's grievance).[3]

Jail authorities emailed plaintiff's grievance to the Cook County Sheriff's Office of Professional Responsibility (OPR) for review and/or investigation. [97] 3 at ¶ 6. The email transmitting the grievance stated that "IIC Services Central Office will provide the response to this grievance." Pl. Exh. A at CCSAO 25. "IIC Services" refers to Individuals in Custody Services, which is "the department responsible for receiving, processing, tracking, organizing, and maintaining records related to grievances submitted by inmates." *Taylor v. Dart*, 23 C 16024, 2025 WL 1233988, at *2 n.1 (N.D. Ill. Apr. 29, 2025).

On March 3, 2023, plaintiff received and signed an "Individual In Custody Grievance Response/Appeal Form," which stated that his grievance had been referred to OPR. [97] 3 at ¶¶ 7-8; *see also* Def. Exh. C at CCSAO 44. The response also contained the following language immediately underneath plaintiff's signature:

> INDIVIDUAL IN CUSTODY'S REQUEST FOR AN APPEAL
>
> To exhaust administrative remedies, a grievance appeal must be made on this form and within 15 calendar days of the date the individual received the above noted response. An appeal must be filed in <u>ALL</u> circumstances in order to exhaust administrative remedies, regardless if the grieved issue(s) have been referred for further review and/or

[3] Citations to exhibits introduced at the *Pavey* hearing appear as "Pl. Exh. __ at CCSAO __" and Def. Exh. __ at CCSAO _," with the page number corresponding to the Bates-stamp number in the bottom-right corner of each page.

> investigation. Any pending O.P.R. review or investigation, is NOT part of the grievance appeal process.

[97] 3-4 at ¶ 11; Def. Exh. C at CCSAO 45.

On March 9, six days after receiving the response to his grievance, plaintiff was transferred from the Cook County Jail to the Illinois Department of Corrections (IDOC) to begin serving a prison sentence. [97] 4 at ¶ 12. Plaintiff did not file an appeal from the March 3 referral of his grievance to OPR either before or after his transfer to IDOC custody. [*Id.*] at ¶ 13. Nor did plaintiff receive any further information about his grievance from jail officials after March 3. *See Taylor*, 2025 WL 1233988, at *2. However, on July 6, 2023, IIC Services prepared an "Emergency Grievance Action Review Form" regarding plaintiff's grievance. Pl. Exh. B. This form reflects the following "Inquiry Findings & Action Taken":

> Detainee Taylor is currently discharged from CCDOC [*i.e.*, Cook County Department of Corrections]. The incident that detainee Taylor refers to in his grievance was documented in CCOMS Div6-2023-4293.

*Id.*

## B. Litigation

Plaintiff filed this suit in November 2023 against defendants Hidalgo, Mintah, Cook County Sheriff Thomas Dart, and "other unknown Cook County correctional officers" who responded to the altercation between him, Hidalgo, and Mintah and "dragged the Plaintiff, who was in and out of consciousness, off the tier." [1] at ¶ 13. Plaintiff later amended his complaint to name defendant Ochoa as the unknown officer involved in these events. [31]; *Taylor*, 2025 WL 1233988, at *2. Defendants answered the amended complaint and reasserted the failure-to-exhaust defense.

### 1. Summary Judgment Proceedings

In January 2025, defendants moved for summary judgment on their exhaustion defense, contending that plaintiff's failure to appeal the March 3 response stating that his grievance had been referred to OPR constituted a failure to exhaust administrative remedies. [51] 7-9. Defendants also argued that plaintiff had not exhausted his claims against Ochoa because Ochoa was not named in the grievance. [*Id.*] 9-10. Plaintiff responded that he was not required to appeal the March 3 response because it was not a negative or final disposition of his grievance. *See Taylor*, 2025 WL 1233988, at *3. Plaintiff also contended that jail officials never informed him how to appeal a grievance once he was no longer in Cook County custody.

District Judge Kocoras granted defendants' motion in part and denied it in part. As for plaintiff's argument that he was not required to appeal the March 3 grievance response, Judge Kocoras recognized that the response "explicitly tells Plaintiff that he must take action in response to the OPR referral in order to exhaust the Jail's grievance procedure" and "even provides space for Plaintiff to set forth the basis for his appeal." *Taylor*, 2025 WL 1233988, at *5. But Judge Kocoras questioned why plaintiff would have been required to appeal in these circumstances:

> The Court can't help but wonder what, exactly, Plaintiff was supposed to put in that space. While [the Seventh Circuit's decision in] *Hacker* [*v. Dart*, 62 F.4th 1073 (7th Cir. 2023)] is distinguishable from this case [because the notice in *Hacker* did not say an appeal was required in all circumstances, even when the grieved issue(s) have been referred to OPR], the reasoning behind the decision is applicable here. In a nutshell, Defendants argue that Plaintiff was supposed to appeal a response devoid of any substance that served no other purpose but to inform Plaintiff that his grievance was going to be referred to OPR. What would Plaintiff appeal? Nothing Plaintiff received stated that his grievance was denied or gave an opinion on its merits. To the contrary, the accompanying form states the responding officer "cannot substantiate or deny your allegations." These documents state that any pending OPR review or investigation is not part of the grievance appeal process, and further instruct Plaintiff he may follow up by contacting OPR directly. They do not tell Plaintiff who to contact regarding his appeal, or where to send it.
>
> It seems wholly counterintuitive–bizarre, really–to require an inmate to appeal a notice that offers no determination of the merits of his grievance but merely states that (1) the grievance was referred to OPR for investigation, and (2) any investigation by OPR is not part of the grievance appeal process. As [the] Seventh Circuit in *King v. Dart* aptly explained:
>
>> Indeed, it is difficult to imagine what purpose an appeal of the grievance response form could possibly have served. If King had appealed the referral notice, the Jail would have likely reiterated that it referred the grievance to OPR and advised him to wait for the results of that investigation. Under CCDOC policy, social workers who collect grievances do not make any determination on the merits of a grievance and merely forward the grievance to an entity for response. There is no evidence suggesting that the Jail had a different protocol for prisoners who appealed their referrals. And what if King attempted to sue after receiving

> this unsatisfactory response to his appeal? The district court might have dismissed his case because his OPR investigation was still pending.

*Taylor*, 2025 WL 1233988, at *5 (internal footnote and citation omitted).

After offering this critique of the Jail's appeal requirement, the District Judge did not decide whether plaintiff was required to appeal the March 3 grievance response. Rather, Judge Kocoras concluded that, "even if the Court accepts that Plaintiff was required to appeal the notice of the OPR referral, genuine factual disputes remain that preclude the entry of summary judgment on the issue of exhaustion." *Taylor*, 2025 WL 1233988, at *6. The District Judge then identified several unresolved factual issues, including (1) "how was Plaintiff supposed to know where to submit his form, either before or after his transfer" to IDOC; and (2) whether plaintiff had ever received a Cook County Jail inmate handbook, which contains a more detailed description of the grievance process. *Id.* Given the disputed factual questions "whether the Jail's administrative remedies were available to Plaintiff," the District Judge determined that a *Pavey* hearing was necessary. *Id.*, at *7. Judge Kocoras referred the case to the undersigned for "a *Pavey* hearing and a report and recommendation on the issue of Defendants' affirmative defense of failure to exhaust administrative remedies." *Id.*, at *8; [59].

Finally, the District Judge concluded that Officer Ochoa was entitled to summary judgment because the grievance not only failed to mention Ochoa by name but also failed to "indicate[ ] the presence of other officers at any point in the altercation." *Taylor*, 2025 WL 1233988, at *7. Plaintiff moved for reconsideration of that ruling, and the District Judge found that "a question of fact exists as to whether Taylor exhausted his administrative remedies with respect to Officer Ochoa and, if not, whether the failure to do so can be excused." [73] 4. As Judge Kocoras explained:

> [T]he primary purpose of the grievance is to put the jail on notice. Given Taylor's description of the incident and his injuries, any reasonable grievance officer investigating the claim would surely review body-worn camera footage of the entire interaction, including Taylor being taken from the cell block to the hospital unit. Body-worn camera footage shows Taylor's head hitting the wall and the resulting seizure, and confirms Officer Ochoa was present when that happened.

[*Id.*].

### 2. *Pavey* Hearing

The Court held a *Pavey* hearing on May 3, 2026. The Court heard testimony from plaintiff; Maretta Lake, the Director of IIC Services; and Michael Flamburis, a

Senior Investigator for OPR. The Court received several documentary exhibits related to plaintiff's grievance. *See* Def. Exh. C (plaintiff's grievance and IIC's response); Def. Exh. D (Cook County Jail inmate handbook); Def. Exh. E (Investigator Flamburis's report); Pl. Exh. A (March 3, 2023, correspondence from IIC regarding plaintiff's grievance); Pl. Exh. B (IIC Services Department's July 6, 2023, Emergency Grievance Action Review Form). The Court also received and reviewed two videos of the incident, one from a stationary camera in plaintiff's cell block (Def. Exh. F) and one clip of body-worn camera footage depicting plaintiff being taken out of the cell block and to the healthcare unit (Def. Exh. G).

### i. Plaintiff

Plaintiff testified that, on February 24, 2023, he was released from his cell at the Cook County Jail by defendants Mintah and Hidalgo and placed in handcuffs. During a pat-down, Officer Mintah took a piece of paper, on which several phone numbers were written, from plaintiff's pocket. [99] 13:4-24. Plaintiff told Mintah that he needed the paper back, and Mintah responded that "he'll decide if he want to give it back." [*Id.*] 15:3-7. Plaintiff, whose hands were cuffed to the front of his body, grabbed the paper out of Mintah's hands. This prompted Mintah to forcefully push plaintiff into the wall "and from there it was just like mayhem. I was forcefully slammed to the ground, and then I just remember getting beat." [*Id.*] 15:8-16. Officers Mintah and Hidalgo were the only officers present at first, but "a lot of officers" soon arrived on the scene. [*Id.*] 15:91-21. Plaintiff was "dragged" down a flight of stairs because he was "in and out of consciousness" and taken "to healthcare." [*Id.*] 15:24-16:7. Because he had lost consciousness during the incident, plaintiff did not know which officers were carrying him to the healthcare unit. [*Id.*] 16:10-18. After reviewing video footage obtained during discovery, plaintiff, in consultation with his attorney, learned that defendant Ochoa was one of the officers carrying him. [*Id.*] 16:10-13. At some point during the encounter, plaintiff had a seizure and was taken to a hospital for treatment. [*Id.*] 55:19-56:4. Plaintiff had never had a seizure before. [*Id.*] 49:11-12.

On February 26, plaintiff prepared a grievance about this incident. [99] 18:22-24. Plaintiff was generally aware from his time in custody that inmates could file grievances, but this was the first grievance he had filed. [*Id.*] 19:3-9. Plaintiff denied that he had been issued a copy of the jail's inmate handbook, but he testified that there were copies of the handbook in the dayroom. [*Id.*] 19:10-18. Plaintiff had never heard "the rules in the handbook being projected on the TVs" in his area of the jail. [*Id.*] 19:24-20:1. In preparing his grievance, plaintiff followed the instructions on the grievance form. [*Id.*] 22:10-14. He knew "to put what happened with the incident and just to sign [his] name." [*Id.*] 21:11-16. Plaintiff was able to identify Officers Mintah and Hidalgo and include their badge numbers in the grievance because he had received a disciplinary ticket containing this information. [*Id.*] 22:18-25. Asked about

his use of "COs" and "officers" in the grievance, plaintiff agreed that these were references to only Officers Mintah and Hidalgo. [*Id.*] 23:21-25:8.

Plaintiff testified that, on March 3, he received and signed a response reflecting that his grievance had been referred to OPR. [99] 45:3-6. The response directed plaintiff to "Please See Attached," but plaintiff testified that there were no additional pages attached and he received only the single response page. [*Id.*] 26:15-18, 30:13-16, 44:19-23. Plaintiff acknowledged that the response form instructed that, "[t]o exhaust administrative remedies, a grievance appeal must be made on this form and within 15 calendar days" and that "[a]n appeal must be filed in all circumstances in order to exhaust administrative remedies, regardless if the grieved issue has been referred for further review and/or investigation." [*Id.*] 32:10-17. Nevertheless, plaintiff did not appeal. [97] 4 at ¶ 13. Plaintiff explained that he could not appeal because he was transferred to IDOC custody a few days after receiving the response. [99] 32:18-25. As the parties stipulated, plaintiff was transferred to IDOC custody on March 9, six days after receiving the response to his grievance. [97] 4 at ¶ 12. Plaintiff acknowledged that he did not make any efforts to appeal the grievance between March 3 and March 9. [99] 38:24-39:20, 40:3-42:18. Plaintiff also testified that he did not appeal because "I didn't believe my grievance was needed to be appealed. I thought it was being investigated, so I didn't believe I needed to appeal it." [*Id.*] 34:10-13. Plaintiff wanted his allegations of excessive force to be investigated. [*Id.*] 45:19-21.

After plaintiff entered IDOC custody on March 9, he did not receive a response or any further correspondence about his grievance. [99] 46:1-8, 47:5-14. This was so even though IIC apparently resolved the grievance on July 9, 2023. An IIC Emergency Grievance Action Form executed that day reflects IIC's "Inquiry Findings & Action Taken" respecting the grievance:

> Detainee Taylor is currently discharged from CCDOC. The incident that detainee Taylor refers to in his grievance was documented in CCOMS Div6-2023-4293.

Pl. Exh. B at CCSAO 27.

Regarding Officer Ochoa, plaintiff testified that he did not name Ochoa in the grievance because, due to "being in and out of consciousness, I didn't exactly know what was dragging me at the time." [99] 48:19-24. During discovery in this case, plaintiff's lawyer obtained body-worn camera footage documenting the incident in question. Plaintiff viewed the footage and learned that Ochoa was the officer who was carrying him when his "head made contact with the concrete doorway into the healthcare unit," immediately after which plaintiff had a seizure. [*Id.*] 50:23-51:6.

### ii. Director Lake

IIC Director Lake testified that the Cook County Jail's inmate handbook contains instructions for appealing a grievance response, including "how to appeal a grievance response once [an inmate is] no longer in the custody of" the Cook County Department of Corrections. [99] 69:13-16. Lake also testified that, during the COVID-19 pandemic through 2025, the contents of the inmate handbook were broadcast three times a day on televisions in the jail's dayroom. [*Id.*] 62:10-18. Lake then read the rules "for appealing grievances when detainees are no longer in the custody of CCDOC" into the record:

> To file/submit a grievance after your CCDOC incarceration, you are required to utilize the following mailing address and your envelope must be post-marked within 15 calendar days of the occurrence of the incident, problem, or event that you are grieving.
>
> CCDOC IIC Services Department
> 2700 S. California Ave.
> Chicago, IL 60608
>
> You will not be retaliated against for filing a grievance or appealing a grievance response.

[*Id.*] 70:5-12; Def. Exh. D at CCSAO 88.

Lake explained that when a grievance is referred to OPR, "they typically include an attachment." [99] 71:7-9. She identified Defendants' Exhibit C at CCSAO 44 as the "attachment that is typically provided to the individuals in custody when their grievance has been referred to" OPR. [*Id.*] 71:10-15.[4] This form states that:

> Although this R/Supv. cannot substantiate or deny your allegation(s), please be advised that your grievance has been forwarded to the Offices of Professional Review and Divisional Superintendent for their review and/or investigation.
>
> You may follow-up with the Office of Professional Review by contacting their office directly, by utilizing the address below.
>
> To exhaust your administrative remedy (regardless of the OPR investigation review, determination, or outcome) you must appeal this immediate grievance response within 15 calendar days.

[4] This is the form that plaintiff testified he did not receive.

Office of Professional Review
3026 S. California Ave
Building 2 / 4th floor
Chicago, Illinois 60608

Def. Exh. C at CCSAO 44.

Lake testified that, when plaintiff received the March 3 response to his grievance, he also received the attachment containing OPR's address. [99] 72:25-73:3. But Lake acknowledged that she had no first-hand knowledge that this was true; rather, an unidentified staff member told Lake that he or she had given plaintiff the attachment. [*Id.*] 73:4-10. Lake also did not know whether plaintiff had ever received an inmate handbook. [*Id.*] 73:11-14.

According to Lake, the March 3 response "was not a final determination" of plaintiff's grievance. [99] 75:6-21. Lake then explained–or tried to explain–why plaintiff was nevertheless required to appeal that response:

> Q: Now, we've talked a lot about appeals and what you need to appeal. An individual in custody has to provide a basis for an appeal, true?
>
> A: Not necessarily.
>
> Q: Well, is that what the form says? I highlighted it. Individual –
>
> A: But –
>
> Q: Let me finish. Individual in custody basis for appeal; that's in bold, right?
>
> A: Uh-huh, yes.
>
> Q: So, let me ask you something. In your decades of experience with the Sheriff's Office, can you tell me what would be the basis to appeal a referral for investigation of excessive force to OPR?
>
> [Defense counsel]: Objection. Relevance.
>
> The Court: Overruled.
>
> A: So, it's their policy. So, if –
>
> Q: I don't mean to interrupt. Whose policy?

A: The Sheriff's Office.

Q: Okay.

A: It states on the form, on the attachments as well as the grievance, that if you want to exhaust your administrative remedies, you must appeal. If you just write appeal and the date, that's fine. We move it on. It's appealed.

Q: But appeal for what purpose?

[Defense counsel]: Same objection, your Honor.

The Court: Overruled.

A: It's appealed because you want to exhaust your administrative remedies.

* * *

Q: Let me go back to my question. What would be the basis – an inmate who is beaten by – allegedly beaten by guards and IIC says, we're going to send this up the chain to OPR, we're going to let them investigate, if you're that inmate, why would you ever appeal that?

A: You're appealing to exhaust your administrative remedies. That's it. That's the rule.

Q: Yeah. That's the rule. That's the Sheriff's rule, right?

A: Correct.

[*Id.*] 76:1-78:2.

### iii. Investigator Flamburis

OPR Senior Investigator Flamburis was assigned to investigate plaintiff's grievance, and he reviewed officer reports as well as video footage from both fixed cameras within the jail and officer body-worn cameras. [99] 79:10-17, 80:10-13, 80:19-23. Flamburis acknowledged that his report failed to mention that he had reviewed the body-worn camera footage that was admitted at the *Pavey* hearing. [*Id.*] 88:3-15; *see* Def. Exh. E at CCSAO 99 (list of evidence reviewed by Flamburis during OPR investigation).

Flamburis testified that the "focal points" of his investigation were Officers Hidalgo and Mintah because those were the only officers named in the grievance and the grievance did not put him on notice that plaintiff "was grieving his head being hit in the threshold of the doorway[.]" [99] 85:2-6. Flamburis acknowledged that the body-worn camera footage showed Ochoa carrying plaintiff through the door to the healthcare unit and plaintiff's head striking the concrete doorway, but Flamburis did not believe that Ochoa had used excessive force against plaintiff. [*Id.*] 81:3-18, 84:18-22. Flamburis also believed that his investigation was "thorough and complete" even though he did not interview plaintiff, Mintah, Hidalgo, Ochoa, any of the inmates who had witnessed the initial encounter between plaintiff and Hidalgo and Mintah, any of the nurses who saw plaintiff have a seizure, or the medical providers at Stroger Hospital. [*Id.*] 90:5-91:5.

## Legal Standard

To exhaust administrative remedies, a prisoner must grieve his claim through "all steps that the agency holds out" and must "do[ ] so *properly* (so that the agency addresses the issues on the merits)." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (emphasis in original). Courts require "strict adherence to these procedures: prisoners must take each step required by a state's administrative rules governing the prison grievance process." *Jackson v. Esser*, 105 F.4th 948, 956 (7th Cir. 2024). But "[p]risoners need only exhaust 'available remedies,' not remedies that are unavailable." *Id.* at 956-57. "The availability of a remedy is not a matter of what appears on paper, but, rather, whether the paper process was in reality open for the prisoner to pursue." *Booker v. Dart*, No. 23 C 5897, 2025 WL 2347832, at *3 (N.D. Ill. Aug. 14, 2025). "An administrative remedy is not unavailable if it is merely confusing or ambiguous," but "when a remedy is so opaque that it becomes essentially unknowable, such that no ordinary prisoner can make sense of what it demands, then prisoners are no longer required to exhaust." *Id.* (internal quotation marks omitted). Courts expect that prisons "create understandable grievance procedures, ones clear and transparent enough to allow ordinary inmates to navigate them." *Hacker v. Dart*, 62 F.4th 1073, 1078 (7th Cir. 2023).

Because exhaustion is an affirmative defense, defendants have the burden of proof. *Strepek v. Dart*, No. 22 C 1713, 2026 WL 353579, at *5 (N.D. Ill. Feb. 9, 2026).

## Discussion

### I. An Appeal from the March 3 Grievance Response Was Not an Available Remedy.

Plaintiff argues that he was not required to appeal the March 3, 2023, response to his grievance, which informed him that the grievance had been referred to OPR. [100] 3. Emphasizing Director Lake's testimony that the response was not a final

determination on the merits of his grievance, plaintiff contends that the appeal requirement "is nothing more than a procedural trap that makes the process practically unusable for detainees." [*Id.*]. Defendants respond that this argument is foreclosed by Judge Kocoras's summary-judgment ruling, which criticized the appeal requirement but recognized that the response plaintiff received required that an appeal be filed in "all circumstances." [101] 3; *see Taylor*, 2025 WL 1233988, at *4-5.

Having considered the District Judge's decision, the relevant case law, and the evidence presented at the *Pavey* hearing, the Court concludes that an appeal from the March 3 grievance response was not an available remedy and that plaintiff's failure to launch such an appeal does not constitute a failure to exhaust administrative remedies.

First, the Court disagrees with defendants that the District Judge resolved this issue in their favor at summary judgment.

On the contrary, Judge Kocoras's decision merely assumed that an appeal from the March 3 grievance response was required but denied summary judgment based on the existence of factual disputes bearing on whether that remedy was, in fact, available to plaintiff. This is plain from the section of the ruling where the District Judge reviewed the Seventh Circuit cases that had addressed the same appeal requirement at issue here. *See Taylor*, 2025 WL 1233988, at *4-5. After completing that survey and questioning what purpose an appeal from an OPR referral could possibly have, *see id.*, at *5-6, Judge Kocoras held that "*even if the Court accepts that Plaintiff was required to appeal the notice of the OPR referral*, genuine factual disputes remain that preclude the entry of summary judgment on the issue of exhaustion." *Id.*, at *6 (emphasis added). Contrary to defendants' position, this was not a ruling that plaintiff *was* required to appeal the March 3 grievance response. It was a conclusion that defendants would not be entitled to summary judgment *even if* an appeal were required because of the factual disputes surrounding plaintiff's ability to appeal the response. The Court therefore finds that this is a live issue that was encompassed within the District Judge's referral of this case to the undersigned–as well as the parties' limited consent to the undersigned's jurisdiction for purposes of conducting and resolving the issues related to the *Pavey* hearing–and must be resolved in connection with the resolution of defendants' exhaustion defense.[5]

---

[5] Defendants do not argue that this issue is outside the scope of either the referral for a *Pavey* hearing or the limited consent; they argue only that the District Judge previously resolved the issue. *See* [101] 3. The Court also notes that, at the October 15, 2025, hearing at which the parties entered the limited consent, the Court (1) heard argument from the parties whether the District Judge's summary-judgment ruling resolved whether plaintiff was required to appeal and (2) ordered supplemental briefing on that question [82], though the supplemental briefs were not filed after the initial date for the *Pavey* hearing was vacated and the *Pavey* hearing was stayed for several months at the parties' request, *see* [85, 88, 90]

Second, an appeal from the March 3 grievance response was not an available remedy, and plaintiff's failure to file such an appeal does not bar his claims.

The Seventh Circuit has been unsparing in its criticism of the Cook County Jail's requirement that inmates whose grievances are referred to OPR must file an appeal from that referral to exhaust their administrative remedies. Those criticisms stem from the court of appeals' recognition that requiring an inmate to file such an appeal is not only "hopelessly confusing," *Hacker*, 62 F.4th at 1083, but also appears to serve no purpose whatsoever.

In *Hacker*, a detainee at the Cook County Jail had–like plaintiff here–received a notice that his grievance had been referred to OPR but did not appeal the referral. The district court concluded, for that reason, that Hacker had not exhausted his administrative remedies and granted summary judgment to defendants. The Seventh Circuit reversed. The court found that "prisoners at the Cook County Jail" were faced with a "a labyrinthine and confusing process in circumstances where, as here, the jail referred grievances against correctional officers to OPR." 62 F.4th at 1082. As the court of appeals emphasized, a referral to OPR "did not indicate that OPR's involvement would lead to a negative disposition of the underlying grievance." *Id.* at 1081. In the Seventh Circuit's view, "the clear and sensible takeaway from the notice was that Hacker should stand by while OPR investigated his complaint[.]" *Id.* "Truth be told," the court of appeals continued, "we have a difficult time understanding the process ourselves. *Not even defendants* could offer us a meaningful defense of that process at oral argument." *Id.* (emphasis added). Finding the appeal requirement to be "hopelessly confusing," *id.* at 1083, the Seventh Circuit held that "Cook County Jail's grievance procedures became unavailable" after the jail informed Hacker that his grievance had been referred to OPR, *id.* at 1081.

The requirement to appeal an OPR referral was at issue again in *King v. Dart*, 63 F.4th 602 (7th Cir. 2023). There the Seventh Circuit concluded that "[a] commonsense reading" of a referral to OPR "suggest[s] that there was nothing" for a prisoner to do because "the notice appeared to be an update regarding the grievance procedure, not a denial of his grievance." *Id.* at 607. Indeed, the court of appeals found it "difficult to imagine what purpose an appeal of [such a] grievance response could possibly have served." *Id.* The court held that appealing from a referral to OPR was not an available remedy because "the Jail's communications to King presented unintuitive, conflicting directions regarding the grievance process, effectively obscuring the process such that there was no conceivable step for him to take." *Id.* at 608 (internal brackets and quotation marks omitted).

Defendants might respond that these cases are distinguishable and their criticisms outdated because, unlike in *Hacker* and *King*, the Jail now expressly

[82]. This course of proceedings reinforces the Court's conclusion that it is necessary and appropriate for the undersigned to resolve that issue now.

instructs inmates that an appeal is required in all circumstances, including when a referral to OPR occurs. As the District Judge recognized at summary judgment, the response plaintiff received on March 3, 2023, advised that "**[a]n appeal must be filed in ALL circumstances** in order to exhaust administrative remedies, **regardless if the grieved issue(s) have been referred for further review and/or investigation**." *Taylor*, 2025 WL 1233988, at *4 (emphasis in original). In the Court's view, however, this is a distinction without a difference. No matter how clear the instructions, requiring an inmate to appeal a grievance response like an OPR referral–a response that has nothing to do with the merits of the grievance–remains the same "hopelessly confusing," counterintuitive, and bizarre process that the Seventh Circuit encountered in *Hacker* and *King*. *Accord Booker*, 2025 WL 2347832, at *4 (OPR referral containing same appeal language as plaintiff's response but "lacking any detail into OPR's investigative actions still suggests that a detainee should stand by while OPR investigated his complaint against") (internal quotation marks and brackets omitted).

The proof introduced at the *Pavey* hearing confirmed that the Jail's requirement that an inmate appeal an OPR referral serves no meaningful purpose and is unintelligible to ordinary inmates. Director Lake, who had been the IIC Director for two years and an assistant director for eight years and was familiar with the inmate grievance process, *see* [99] 61:18-62:18, 68:15-70:24, was asked to identify any possible "basis to appeal a referral for investigation of excessive force to OPR," but she could not identify even one. [*Id.*] 76:14-24. Lake confirmed that the referral to OPR itself was not a final determination of the inmate's grievance, [*id.*] 75:6-21, and she conceded that an inmate does not even need to have or to identify a substantive basis to appeal an OPR referral. *See* [*id.*] 76:4-6 ("Q: An individual in custody has to provide a basis for appeal, true? A: Not necessarily."). Rather, "if [an inmate] just write[s] appeal and the date" on the appeal form, "that's fine. We move it on. It's appealed." [*Id.*] 77:3-4. Asked to identify the purpose of such an appeal, Director Lake responded, "It's appealed because you want to exhaust your administrative remedies . . . You're appealing to exhaust your administrative remedies." [*Id.*] 77:5-9, 23. All of this demonstrates that appealing an OPR referral is not an available or meaningful remedy: there is no final or merits-based decision embedded within the referral, and the only reason to appeal is because an inmate cannot exhaust his administrative remedies without filing this otherwise pointless appeal. As Director Lake testified, "That's it. That's the rule." [*Id.*] 77:24.

An appeal requirement that must be used when an inmate receives a non-final, non-substantive response to his grievance, when that response in no way suggests that there is anything, in fact, to appeal, and when a high-ranking Jail official cannot even identify a single basis on which to appeal that response is not a "clear and transparent" remedy that is capable of being used by "ordinary inmates." *King*, 63 F.4th at 606. It is, rather, a procedural dead-end to "trap unwary prisoners" who reasonably conclude that a referral of their grievance to OPR requires no further

action on their part. *Woodford*, 548 U.S. at 102. This Court therefore agrees with the decision in *Booker* that

> the response/appeal form's updated language still does not make the grievance process available because it does not clarify what action a detainee should take other than to futilely appeal a notification that ostensibly showed "the process working as it should." *Hacker*, 62 F.4th at 1081. Consequently, CCJ's "unintuitive, conflicting directions regarding the grievance appeals process[ ] effectively obscure[d] the process such that 'there was no conceivable step for him to take.'" *Id.* (quoting *Reid v. Balota*, 962 F.3d 325, 330 (7th Cir. 2020)). Exhaustion, therefore, does not stand as a bar to [plaintiff's] pursuit of his claims.

2025 WL 2347832, at *5.

In sum, plaintiff was not required to appeal the referral of his grievance to OPR, and his failure to file such an appeal does not constitute a failure to exhaust administrative remedies.

## II. Defendants Did Not Prove That a Remedy Remained Available to Plaintiff after His Transfer to IDOC.

Even assuming, *arguendo*, that plaintiff was required to appeal the March 3 response notifying him of the OPR referral, his failure to do so does not bar his claims. This is because defendants failed to prove by a preponderance of the evidence that any remedies were, as a factual matter, available to him once he was transferred to IDOC custody.

First, the Court finds that the remedy of appealing from the March 3 grievance response was not available to plaintiff after his transfer to IDOC custody on March 9, 2023. Plaintiff testified that he could not appeal the response once he was transferred to IDOC custody on March 9, *see* [99] 32:18-25; [97] 4 at ¶ 12, and the Court credits this testimony. Most importantly, defendants did not prove that plaintiff knew how to appeal the March 3 grievance response after his discharge from the Cook County Jail. Director Lake testified that the inmate handbook contains instructions on how to appeal in such circumstances, but the Court rejects that testimony for two reasons. First, plaintiff credibly testified that he was never given an inmate handbook, and defendants introduced no evidence to contradict plaintiff's claim. *Compare King*, 63 F.4th at 607 (discussing "the Inmate Handbook King signed when he was first booked into the Jail"). Second, the section of the inmate handbook relied on by defendants does not, in fact, instruct inmates how to file an appeal if they are not in Cook County custody. Instead, it instructs how "[t]o *file/submit* a grievance after your CCDOC incarceration," Def. Exh. D at CCSAO 88 (emphasis added), not how to initiate an appeal if the inmate's grievance has been referred to OPR or

otherwise disposed of. The Court recognizes that Lake testified that inmates could submit appeals to the address set forth in this section of the handbook, *see* [99] 70:13-24, but the Court questions how an inmate would know that when the handbook states that this address is to be used only to "file/submit" a grievance once out of Cook County custody. Judge Kocoras identified this very concern in his ruling at summary judgment, *see Taylor*, 2025 WL 1233988, at *7, but defendants failed to prove how an inmate out of custody would know to submit his appeal to that address. This is another instance of the Jail's grievance procedure being so opaque as to be unavailable.

Defendants emphasize that plaintiff could have appealed at any time after receiving the OPR referral on March 3 and before he left the jail on March 9, but this argument ignores that jail rules entitled plaintiff to a 15-day period in which to appeal–such that plaintiff's appeal deadline was March 18. Defendants effectively denied plaintiff the ability to file an appeal from March 10 through March 18 by failing to instruct him how to do so after his transfer. In any event, defendants also failed to prove that plaintiff received the attachment to the grievance response that contained the address for OPR, where plaintiff may have been able to submit an appeal while still in Cook County custody.[6] Plaintiff denied receiving the attachment, and defendants did not meaningfully contradict this testimony. Director Lake believed that plaintiff had received the attachment, but her testimony was based on the say-so of an unidentified staff assistant who allegedly gave the attachment to plaintiff but did not testify at the *Pavey* hearing. Defendants tried to impeach plaintiff on this point with his deposition testimony but failed to do so.[7] Nor does the Court agree with defendants that plaintiff stipulated that he received the attachment. The pre-hearing stipulations establish only that plaintiff received a March 3 response from IIC directing plaintiff to "Please See Attached," and that "Plaintiff's attachments" informed him that he had to appeal to exhaust his administrative remedies. [97] 3 at ¶¶ 8-9. The stipulations do not reflect an agreement that the attachment was received by plaintiff. And while plaintiff appears not to have disputed that he received the attachment at summary judgment, *see* [53] at ¶ 38, the Court does not find that to be dispositive or controlling here. Ultimately this is a credibility issue, the Court finds plaintiff's testimony credible, and the Court finds that defendants have not shown that plaintiff received the attachment. Finally, even

[6] The attachment at issue states that plaintiff "may follow-up with" OPR by contacting OPR at its address on South California Avenue in Chicago. Def. Exh. C at CCSAO 44. It does not say that an appeal should be sent to that address–or where an appeal should be sent. Moreover, the grievance response plaintiff received stated that any OPR investigation was not part of the appeal process and implies that IIC Services would address the appeal. *Id.* at CCSAO 45. Thus, whether plaintiff received the attachment is not dispositive of whether an appeal was practically available to him.

[7] The Court sustained plaintiff's objections to this attempt because (1) the deposition testimony was too vague to establish that plaintiff had previously testified that he received the attachment at issue and thus (2) the prior testimony was not impeaching. *See* [99] 27:11-29:20.

assuming that plaintiff did receive the attachment, that would not establish that the appeal remedy was available to plaintiff. As discussed in footnote 6, *supra*, the attachment states only that plaintiff "may follow-up with" OPR by contacting OPR at the address listed at the bottom of the page, not that plaintiff must submit his appeal there to exhaust his administrative remedies. The attachment thus would have done plaintiff no good even had he received it.

Second, as applied to plaintiff and the grievance at issue, the Court finds that the jail's grievance process itself became unavailable after his transfer to IDOC. Director Lake testified that IIC Services was responsible for addressing plaintiff's grievance. [99] 74:17-24; Pl. Exh. A at CCSAO 25. But the evidence before the Court shows that IIC Services took no meaningful or substantive action respecting the grievance precisely because plaintiff was no longer in Cook County custody. This is evident from the Emergency Grievance Action Review Form that IIC prepared on July 6, 2023. Rather than addressing the merits of plaintiff's grievance, IIC simply noted that plaintiff had been discharged from Cook County custody and that the alleged excessive-force incident had been documented elsewhere. Defendants offered no evidence to explain the significance of this finding or why IIC appears not to have issued a final or merits-based determination respecting the grievance. In these circumstances, the Court holds that the grievance process itself became unavailable to plaintiff–that is, incapable of addressing his grievance–once he left Cook County custody. *See Ross v. Blake*, 578 U.S. 632, 643 (2016) ("an administrative procedure is unavailable when . . . it operates as a simple dead end–with officers unable . . . to provide any relief to aggrieved inmates").

## III. Claims against Ochoa

Defendants argue that plaintiff's claims against Officer Ochoa are barred because, regardless of whether an appeal was required or available to plaintiff, plaintiff's grievance did not put the Jail on notice that plaintiff was complaining about Ochoa's conduct. Defendants contend that (1) the grievance does not refer to Ochoa by name or indirectly and (2) plaintiff's amended complaint asserts a distinct theory of liability as to Officer Ochoa that was not raised in the grievance. [101] 7-10. Plaintiff responds that his inability to name Ochoa "at the time of the grievance is directly tied his medical condition (in and out of consciousness) caused by the initial beating by Mintah and Hidalgo." [100] 5. Plaintiff contends that his grievance properly alerted jail officials to the issues to be investigated because it referred to seizure attacks and head injuries, and because video footage documenting his head injuries was available during the investigation into his grievance. [*Id.*] 6.

### A. Plaintiff's Loss of Consciousness Excuses His Failure to Name Ochoa in the Grievance.

"One of the purposes of the PLRA exhaustion requirement is to give the Jail a fair opportunity to address the prisoner's complaint." *King*, 63 F.4th at 608 (internal brackets and quotation marks omitted). Grievances are not meant "to provide personal notice to a particular official that he may be sued" because "the grievance is not a summons and complaint that initiates adversarial litigation." *Maddox v. Love*, 655 F.3d 709, 722 (7th Cir. 2011) (internal quotation marks omitted). Thus the PLRA "does not require a plaintiff to name defendants in a grievance, only that the grievant provide some identifying information about the accused individuals." *Hernandez v. Cook Cnty.*, No. 23 CV 301, 2025 WL 2380679, at *3 (N.D. Ill. Aug. 15, 2025). Courts have found the exhaustion requirement satisfied "as to defendants not named in a grievance when, from the content of the grievance and the nature of the complained of conduct the prison was clearly on notice that those unnamed defendants were involved." *Jackson*, 105 F.4th at 960.

The Court holds that plaintiff's failure to name Ochoa in the grievance does not constitute a failure to exhaust administrative remedies.

It is undisputed that plaintiff's grievance did not refer to Ochoa by name and focused on the actions of defendants Mintah and Hidalgo. But plaintiff was fully conscious during his initial encounter with these defendants, they were "the only officers [he] knew by name," and plaintiff later received a disciplinary ticket that identified them by name and badge number. [99] 22:18-23:1. After the initial encounter with Mintah and Hidalgo, however, plaintiff was "in and out of consciousness." [*Id.*] 15:23-16:3, 16:11-16, 49:13-22. And despite its focus on Officers Mintah and Hidalgo, the grievance also states that, "due to my experiencing seizure attacks & all the injuries incurred to my head, arms & ribs, I had to be taken to the Cook County Hospital for treatment & was placed on medication[.]" [97] 2-3 at ¶ 5; Def. Exh. C at CCSAO 43. Judge Kocoras previously determined that, "[g]iven Taylor's description of the incident and his injuries, any reasonable grievance officer investigating the claim would surely review body-worn camera footage of the entire interaction, including Taylor being taken from the cell block to the hospital unit." [73] 4. The Court agrees with that determination, and, indeed, Investigator Flamburis testified that he reviewed video footage of the incident during his investigation into plaintiff's grievance. [99] 80:19-23, 84:24-85:6. But unlike Flamburis–whose testimony the Court rejects given his obvious bias in defendants' favor[8]–the Court

[8] Recounting what he saw in the body-worn camera footage that recorded the incident, Flamburis testified that plaintiff "was not cooperative in walking," plaintiff "was refusing to walk on his own," and Ochoa "did the best he could" when he swung plaintiff's body through the dispensary door and caused his head to slam into the door frame. [99] 83:5-8, 24-25; 84:4-6. Having viewed the video footage multiple times, the Court cannot emphasize enough that Flamburis's interpretation of events is hardly, in this Court's view, the most plausible or

finds that, taken together, plaintiff's grievance and the video footage should have alerted jail authorities that plaintiff was grieving the conduct that caused his seizure.

Two pieces of video evidence related to plaintiff's grievance were admitted at the *Pavey* hearing.

The first video, admitted as Defendant's Exhibit F, is a three-minute-and-ten-second clip showing the initial encounter between plaintiff, Hidalgo, and Mintah. It establishes that within two minutes after plaintiff grabs something out of Officer Mintah's hands and he and Officer Hidalgo slam plaintiff to the ground, as many as 14 correctional officers and two supervisors arrive on the scene. The video also depicts Officer Hidalgo on top of plaintiff, repeatedly punching him in the back and the side of his torso. For a lengthy portion of the clip, plaintiff is sprawled on the ground and surrounded by multiple officers, many of whom appear to be using their bodies to keep him pinned to the ground. Due to the angle of the camera and the number of officers surrounding plaintiff, much of what transpired between plaintiff and the officers cannot be seen. At the end of this clip, a group of correctional officers lift plaintiff up, and two officers begin carrying him out of the cell block.

The second video, admitted as Defendants' Exhibit G, is an eight-and-a-half-minute clip recorded by the body-worn camera of a supervisor, Sergeant Campos. At the 2:30 mark, Campos enters the cell block where the altercation between plaintiff, Hidalgo, and Mintah began. About 50 seconds later, Campos approaches a group of five officers who are surrounding plaintiff and instructs them to "get him up" and "walk him backwards." Two officers then forcefully move plaintiff backwards down a narrow gangway, down a short flight of stairs, and through the same door that Sergeant Campos used to enter the cell block. At the 4:00 mark, Campos instructs four officers who are now surrounding plaintiff–including defendant Ochoa–to cuff plaintiff's hands around his back. The officers appear to struggle to keep plaintiff upright and cuff him, but there are several officers between Campos and plaintiff, so the video does not provide a clear view of what is happening at this point.

Around the 5:02 mark, Campos instructs the officers to "stand him up" and "walk him to the dispensary." A few seconds later, Ochoa and another officer hoist plaintiff up and begin carrying him backwards; Campos's camera is now recording the front of plaintiff's body. Campos shouts at plaintiff to "walk, man. Start walking. Come on, walk." As Ochoa and the second officer are carrying plaintiff to the dispensary–with Ochoa holding him by the left arm and the second officer holding him by the right arm–plaintiff's head slumps forward at times and bobs backwards at others, his eyes appear to be closed, there appears to be blood on his nose and near

convincing interpretation of what the footage reflects. That said, the Court disregards Flamburis's testimony that the video footage and the grievance did not put him on notice of Ochoa's involvement in the incident primarily because it was irrelevant. Whether the Jail should have been on notice of Ochoa's involvement is a factual issue for the Court to resolve.

his mouth, and his legs are dragging on the floor. At the 5:45 mark, Ochoa, the second officer, and plaintiff are approaching the door to the dispensary, and someone instructs plaintiff, "Come on, man. Stop refusing." The door to the dispensary is relatively narrow, such that two people could not walk through it at the same time without pressing into each other or turning their bodies sideways. At the 5:48 mark, the second officer walks around the front of plaintiff's body as he continues to hold plaintiff's right arm and proceeds through the doorway. Officer Ochoa is still holding plaintiff–whose body and head are slumped forward–by the left arm, and Ochoa appears to be bearing most of plaintiff's weight. As Officer Ochoa walks sideways through the doorway, he appears to swing plaintiff's body through the door. Ochoa's body is blocking most of the doorway, however, and Ochoa's movement causes plaintiff's head to loudly slam into the door frame. The second officer who had been carrying plaintiff appears to gasp as this occurs, while another officer yells out, "Watch it, watch it. Careful." Immediately after his head strikes the door frame, plaintiff begins gasping and making what sound like quick, repeated gurgling noises. Campos's camera briefly shows plaintiff writhing on the ground while someone tells plaintiff to "relax." The muffled gasping and gurgling noises continue for about 40 seconds until, around the 6:38 mark, a nurse instructs the officers who are trying to hold plaintiff's body steady to turn him on his side. The video continues for about two more minutes as the officers try to keep plaintiff's body stabilized and a discussion about taking him to the hospital ensues.

The video evidence provides significant and compelling corroboration for plaintiff's testimony that he lost consciousness after being beaten by Hidalgo and Mintah (and potentially other correctional officers), and that his lapses of consciousness prevented him from identifying Ochoa and more specifically grieving Ochoa's conduct.

Even if their actions were justified–an issue not before the Court at this time–Hidalgo and Mintah applied a significant amount of force to plaintiff: they slammed him to the ground, kicked and punched him repeatedly, and used their body weight to restrain him. A few minutes later, Campos's body-worn camera shows Ochoa and another officer dragging plaintiff down a hallway as his head bobs back and forth, his eyes are closed, and he appears incapable of standing or walking on his own. While plaintiff was in this state, Ochoa apparently swung plaintiff's body through the dispensary doorway but caused his head to make loud, forceful contact with a concrete door frame–which caused plaintiff to have a seizure. The Court credits plaintiff's testimony that he lost consciousness because of the encounter with Hidalgo and Mintah and easily concludes that plaintiff's diminished state of consciousness prevented him from identifying Ochoa or referring to him in the grievance–even as an unnamed officer–as the officer whose conduct caused his seizure. No inmate in that state could reasonably be expected to identify Ochoa as the officer whose alleged use of excessive force caused his seizure or make more specific reference to Ochoa's act of swinging plaintiff's body and causing his head to slam into the door frame.

*Accord Martin v. Sec'y of Corrs.*, Civil No. 3:16-cv-2060, 2018 WL 1158250, at *4 (M.D. Pa. Mar. 5, 2018) (rejecting exhaustion defense where "it was not practicable for [plaintiff] to identify the Defendants because he was unconscious during the assault, and, thus, [plaintiff] did not know who was involved in the incident in question"); *Abney v. Younker*, 1:13-CV-1418, 2015 WL 10371482, at *8 (M.D. Pa. Feb. 24, 2015) ("it is not practicable to require an inmate to identify individuals by name [ ] if he was unconscious or only semiconscious at certain times during the assault").

Accordingly, plaintiff's failure to refer to Ochoa in the grievance by name or indirectly does not bar his claims against Ochoa.

### B. Plaintiff's Grievance Encompasses the Conduct that Caused His Seizure.

"To satisfy the PLRA's exhaustion requirement, [plaintiff] must have filed a grievance that raised the same claim as that which is raised in this lawsuit[.]" *Mansoori v. Brown*, No. 17 CV 8846, 2026 WL 472713, at *3 (N.D. Ill. Feb. 19, 2026). "To provide adequate notice, a grievance must describe the nature of the wrong for which redress is sought." *Id.* (internal quotation marks omitted). "An inmate cannot rely on a grievance to exhaust a claim if there is a 'disconnect between the grievance and the complaint." *Rutledge v. Stoppenhagen*, Cause No. 3:24-CV-963-JD-AZ, 2026 WL 501750, at *2 (N.D. Ind. Feb. 23, 2026) (quoting *Bowers v. Dart*, 1 F.4th 513, 517 (7th Cir. 2021)).

Defendants argue that plaintiff's grievance concerns only "a use of force incident" in his cell block that is "attributable solely to Mintah and Hidalgo." [101] 9. According to defendants, that use of force and Ochoa's conduct in dragging plaintiff to the dispensary and causing his head to strike the doorway are "distinct incidents, occurring at different times, in different locations, involving different conduct and different officers." [*Id.*]. This argument might not be completely fanciful had it concerned an inmate who did not lose consciousness after being slammed to the ground and repeatedly hit and kicked by correctional officers, who did not appear to lose the ability to stand upright and walk on his own, and who did not have a seizure immediately after an officer slammed his head into a concrete door frame. But all those things happened to plaintiff, and the Court therefore concludes that the exhaustion doctrine did not require that plaintiff grieve the conduct that caused the seizure with any more specificity than was included in the grievance.

As discussed in Section III.A, *supra*, no reasonable inmate in plaintiff's condition could be expected to parcel out, with the degree of specificity insisted upon by the defense, which officer caused plaintiff's seizure and how that officer had done so. Plaintiff's grievance specifically complained about "my experiencing seizure attacks & all the injuries incurred to my head, arms & ribs," which necessitated his hospitalization. [97] 2-3 at ¶ 5. That plaintiff discussed his seizure defeats defendants'

claim that the grievance was focused only on Mintah and Hidalgo's conduct and that the grievance had nothing to do with the events that transpired after plaintiff was removed from the cell block. After all, the video footage that any reasonable grievance officer would have reviewed (and that Flamburis testified he did review) establishes that plaintiff's seizure occurred immediately after Ochoa–whether accidentally, negligently, or maliciously–swung plaintiff's body through the doorway and caused his head to strike the door frame. All of this establishes that the Jail ought to have been on notice that plaintiff's grievance was directed not only to the initial use of force by Mintah and Hidalgo, but also at the conduct that caused plaintiff's "seizure attacks & all the injuries incurred to [his] head." [*Id.*].

For these reasons, the Court finds that plaintiff's grievance encompasses the conduct that caused his seizure and that there is no "disconnect" between the grievance and the claims in the amended complaint against Ochoa.

**Conclusion**

For the reasons set forth above, the Court holds that the defense of failure to exhaust administrative remedies does not bar plaintiff's claims against defendants Mintah, Hidalgo, and Ochoa. The parties are ordered to meet and confer and file a joint status report by August 28, 2026, that contains: (a) a statement of the parties' plans for next steps in the litigation; (b) the status of settlement discussions; and (c) any other issues the parties wish to raise with the Court.

Heather K. McShain

**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: August 18, 2026**